IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STANLEY JONES,                      )
                                    )
            Plaintiff,              )
                                    )
    v.                              )            1:13CV385
                                    )
LANNA CHANDRASUWAN and              )
BRIAN HOLBROOK, in their            )
individual capacities,             )
                                    )
            Defendants.             )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Presently before this court is a Motion for Summary
Judgment (Doc. 8) filed jointly by Defendants Lanna Chandrasuwan
and Brian Holbrook (collectively, "Defendants"). Plaintiff
Stanley Jones ("Plaintiff") has responded in opposition (Doc.
13), and Defendants have replied (Doc. 15). Plaintiff alleges
damages under two causes of action: a state law malicious
prosecution claim (Count I) and a claim under 42 U.S.C. § 1983
for violation of his Fourth Amendment rights (Count II).

Defendants, who are both North Carolina probation officers,
assert they did not violate Plaintiff's Fourth Amendment rights,
or, alternatively, qualified immunity shields them from
liability. Upon the request of this court (Doc. 16), both
parties filed supplemental briefing on several issues. This

motion is now ripe for adjudication, and for the reasons that follow, Defendants' motion will be granted.

## I.  <u>FACTS</u>

The following facts are undisputed.  In October of 2009, Plaintiff, a public school teacher, was arrested and charged with offenses stemming from improper relations with a student. (Complaint ("Compl.") (Doc. 3) ¶¶ 6–7; Pl.'s Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Resp."), Aff. of Stanley Jones ("Jones Aff.") (Doc. 13-1) ¶ 5.)  In July 2010, Plaintiff accepted a plea in his criminal case. (Jones Aff. (Doc. 13-1) ¶ 10.)  As a result of the plea, Plaintiff was given a suspended sentence and placed on probation for two years. (<u>Id.</u>)

As one of the conditions of his probation, the Guilford County Superior Court ordered that Plaintiff pay $471.50 in court costs and fines, with the schedule of payment to be determined by a probation officer.  (Pl.'s Resp., Judgment (Doc. 13-3) at 1.)  Along with the judgment, the clerk of court gave Plaintiff a "Bill of Costs" with a due-by date of "7/7/2012." (Jones Aff. (Doc. 13-1) ¶¶ 12, 14.).  After entering his plea, Plaintiff had an intake meeting with a North Carolina probation officer.  (<u>Id.</u> ¶ 11.)  Both parties agree that Plaintiff, at

that meeting, did not complete a DCC-2,[1] the internal form that the Department of Community Corrections ("DCC") uses to set up a payment schedule.

During the pendency of the criminal charges, Plaintiff resigned his teaching position and began working for a mobile phone company, Prime Communications, in its Greensboro, North Carolina store.  (Id. ¶¶ 6-7.)  Three months before he accepted his plea, Plaintiff was promoted and transferred to a position with Prime Communications in Augusta, Georgia.  (Id. ¶¶ 8-9.)

Because of the move, the superior court allowed Plaintiff to transfer his supervision from North Carolina to Georgia. (Id. ¶ 10.)  In light of Plaintiff's North Carolina conviction and Georgia residency, the Interstate Compact for Adult Offender Supervision ("Interstate Compact" or "ICAOS") governed Plaintiff's multi-state probation.  (See Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem."), Aff. of Karl Waller ("Waller Aff.") (Doc. 9-2) ¶ 5.)  The Interstate Compact is a formal agreement between all fifty states allowing for the transfer of

---

[1] Plaintiff says he "was not given nor did [he] sign a form 'DCC-2.'"  (Jones Aff. (Doc. 13-1) ¶ 16.)  Defendants claim that Plaintiff signed a DCC-2 form but left before completing the form's substantive components. (Defs.' Resp. in Opp'n to Pl.'s Mot. to Amend, Aff. of LeTonia Williams ("Williams' Aff.") Doc. 25-2) ¶ 20.)

probation supervision between states for adult offenders.[2] (Id. ¶¶ 5-8.) Pursuant to the terms of the Interstate Compact, North Carolina, the "sending state," retained revocation and enforcement authority over Plaintiff's probation while Georgia, the "receiving state," supervised the probation. (Id. ¶¶ 11-12.) Plaintiff paid his monthly supervision fee to Georgia; however, the authority and responsibility to collect the $471.50 remained with North Carolina. (Jones Aff. (Doc. 13-1) ¶¶ 18-20.)

In late 2010, Prime Communications transferred Plaintiff to a new position in Savannah, Georgia. (Id. ¶ 21.) Plaintiff had his probation transferred to the Savannah office, and Jeff Kreiss was assigned as Plaintiff's new probation officer. (Id. ¶¶ 20-24.) Throughout his residency in Georgia, there were no reported violations of Plaintiff's probation from the Georgia authorities.

The events that transpired and led to Plaintiff's arrest for violating his probation began in early 2012, roughly seven months before Plaintiff's supervised release was to end. According to Defendants, in January 2012, Jay Lynn, an official

---

[2] The North Carolina General Assembly directed the Governor to enter into the Interstate Compact for Adult Offender Supervision in N.C. Gen. Stat. §§ 148-65.5 et seq. For a complete list of ICAOS Rules, see Interstate Comm'n for Adult Offender Supervision, ICAOS Rules (2014), available at http://www.interstatecompact.org/Legal/RulesStepbyStep.aspx.

in the North Carolina Interstate Compact Office ("NCICO") in Raleigh, conducted a routine review of Plaintiff's probation file. (Waller Aff. (Doc. 9-2) ¶¶ 28-29.) During the review, Lynn determined that Plaintiff's court costs and fines remained unpaid. (Id. ¶ 29.) Lynn informed Karl Waller, the Interstate Compact District Coordinator, of the unpaid costs and confirmed this outstanding balance with Greensboro Chief Probation and Parole Officer Brian Holbrook ("Defendant Holbrook"). (Id. ¶¶ 4, 29.)

On January 25, 2012, after confirmation of this unpaid balance, Waller sent a "compact action request" to the Interstate Compact Office in Georgia (the "Georgia Compact Office") requesting Plaintiff to pay the outstanding $471.50 by February 1, 2012. (Id. ¶ 30.) Waller included instructions to pay the outstanding amount by mail. (Id.) On February 4, 2012, the $471.50 in court costs and fines remained unpaid, and Waller subsequently prepared an internal violation report based on Plaintiff's failure to pay the outstanding costs. (Id. ¶ 32.)

On February 9, 2012, the Georgia Compact Office sent two responses to the compact action request. The first read as follows: "Be advised the offender was instructed by his supervision officer to make his payment to SC [superior court]. He stated he was going to contact his lawyer about this amount owed & that he expires in July." (Defs.' Mem., First Compact

-5-

Action Request (Doc. 9-6).)  The second read as follows: "The offender reported on this date & his supervising officer instructedhim [sic] to make his payment.  I gave him the information again of the amount owed & the address to mail the payment.  He stated he will pay the balance off by the end of the month."  (Second Compact Action Request (Doc. 9-7).)

In mid-January of 2012, Waller turned the probation file over to Defendant Holbrook to collect the outstanding $471.50. On or after February 15, 2012, Defendant Holbrook instructed Defendant Lanna Chandrasuwan ("Defendant Chandrasuwan"), a probation officer under his supervision, to "follow up" with Plaintiff about the probation violation. (Defs.' Mem. (Doc. 9) at 8; Aff. of Lanna Chandrasuwan ("Chandrasuwan Aff.") (Doc. 9-13) ¶ 15.)

On March 8, 2012, Defendant Chandrasuwan unsuccessfully attempted to directly reach Plaintiff at two phone numbers. (Chandrasuwan Aff. (Doc. 9-13) ¶ 17.)  Plaintiff points out that Defendant Chandrasuwan never contacted the Georgia Compact Office concerning the violation, as required by the Interstate Compact guidelines.  (See Pl.'s Resp. (Doc. 13) at 6 (citing ICAOS Rule 2.101(d)).)  On March 12, 2012, Defendant Chandrasuwan attempted to directly notify Plaintiff by mail of his need to contact her or return to the Greensboro Probation Office to pay the outstanding fines within two weeks.

(Chandrasuwan Aff. (Doc. 9-13) ¶ 19.) Also on March 12, 2012, Defendant Chandrasuwan prepared a Violation Report stating that Plaintiff had violated probation due to his failure to timely pay the court costs. (Id. ¶ 18.) On approximately March 27, 2012, "Chandrasuwan's correspondence to Plaintiff had been returned." (Defs.' Mem. (Doc. 9) at 8; Chandrasuwan Aff. (Doc. 9-13) ¶ 20.) On March 27, 2012, Defendant Chandrasuwan prepared an Addendum Violation Report claiming that Plaintiff "had absconded and was avoiding supervision." (Chandrasuwan Aff. (Doc. 9-13) ¶ 23.)

On March 27, 2012, Defendant Chandrasuwan appeared for a probable cause hearing[3] before a Magistrate Judge in Guilford County, North Carolina, to secure an order for Plaintiff's

_____

[3] Defendant Chandrasuwan refers to the hearing as "a probable cause [hearing]" in her affidavit. Additionally, the Department of Community Corrections Handbook says that the standard is "probable cause." N.C. Dep't of Public Safety, Community Corrections Policy & Procedures 230 (2012), available at https://www.ncdps.gov/div/CC/Policy-ext.pdf. Nevertheless, the actual court records are unclear as to what standard was applied. The violation report, filed under oath, alleges the violations as described specifically hereinafter. However, the order simply recites that "the probation officer has provided the court with a written statement, signed by the probation officer, alleging that the defendant has violated specified conditions of the defendant's probation." (Order for Arrest (Doc. 9-11) at 2.) The statutes pursuant to which the finding was made, N.C. Gen. Stat. §§ 15A-305(b)(4), 15A-1345(a), also do not mention probable cause as the standard. Section 15A-1345(a) requires an order of the court be issued "upon the written request of the probation officer, accompanied by a written statement." Section 15A-305(b)(4) simply states that "[a]n order for arrest may be issued when . . . [a] defendant has violated the conditions of probation."

arrest based on multiple probation violations.  (Id. ¶¶ 23-25.)
In support of her petition for a probation violator arrest
warrant, Defendant Chandrasuwan presented both the March 12th
Violation Report and the March 27th Addendum Violation Report.
The Magistrate Judge subsequently issued an order for
Plaintiff's arrest. (Order for Arrest and Supporting Violation
Reports (Doc. 9-11).)

Plaintiff does not dispute these facts recounting the
actions of the NCICO officers or Defendants Holbrook or
Chandrasuwan, arguing instead that these actions violated
procedural requirements. (See Pl.'s Resp. (Doc. 13) at 4-8.)
Plaintiff does dispute the reports from the Georgia Compact
Office.  Plaintiff recalls a conversation with a representative
from the Georgia Compact Office consistent with the first
response to the compact action request.  (Jones Aff. (Doc. 13-1)
¶¶ 25-27.)  That is, Plaintiff recalls having a brief
conversation (lasting less than five minutes) where he stated
that he realized he still owed the money, that it was due by
July, and that he would contact his attorney to arrange for the
payment.  (Id.)

However, Plaintiff denies having a second conversation with
the representative from the Georgia Compact Office and contends
the second message was sent to "cover the compact officer's duty
to provide the address to Plaintiff for sending payment."

(Pl.'s Resp. (Doc. 13) at 5-6.)  Within a few days of the
meeting, Plaintiff asserts that he called his lawyer to confirm
the money was due in July and that the lawyer's office could
make the payment to the clerk after it received the funds from
Plaintiff.  (Jones Aff. (Doc. 13-1) ¶ 28.)

Understanding that the $471.50 was not due until July,
Plaintiff continued his monthly visits with his Georgia
probation officer without paying the outstanding sum.  Plaintiff
had no other contact with the North Carolina probation officers
until his arrest in May 2012.  (Id. ¶ 29.)

Both parties agree that, on May 1, 2012, the United States
Marshal Service arrested Plaintiff.  (Jones Aff. (Doc. 13-1)
¶ 43.)  On May 2, 2012, Plaintiff paid the outstanding court
costs and fines.  (Id. ¶ 44.)  On May 7, 2012, Defendant
Holbrook secured an order dismissing the probation violation
charges and recalling Plaintiff's order for arrest.  (Id. ¶¶ 48-
50.)  The state court charges were dismissed on May 7, 2012, and
Plaintiff was released from custody on May 8, 2012.  (Id. ¶¶ 45,
51.)

## II.   LEGAL STANDARD

Summary judgment is appropriate where an examination of the
pleadings, affidavits, and other proper discovery materials
before this court demonstrates that no genuine issue of material
facts exists, thus entitling the moving party to judgment as a

matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of initially demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  If the moving party has met that burden, then the nonmoving party must persuade this court that a genuine issue remains for trial.

> When the moving party has carried its burden under
> Rule 56(c), its opponent must do more than simply show
> that there is some metaphysical doubt as to the
> material facts.  In the language of the Rule, the
> nonmoving party must come forward with "specific facts
> showing that there is a genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations and footnote omitted) (quoting Fed. R. Civ. P. 56).  In considering a motion for summary judgment, this court is not to weigh the evidence, but rather must determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  This court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable.  Id. at 255.  However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine.  Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248.  A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

III. **ANALYSIS**

Plaintiff argues that Defendants' actions which led to his arrest for a probation violation infringed upon his Fourth Amendment right to be free from unreasonable seizures and constitute malicious prosecution under North Carolina law. This court first analyzes the federal question contained in Plaintiff's § 1983 claim (Count II), before taking up the state law malicious prosecution claim (Count I).

A. **Section 1983 Fourth Amendment Claim**

Section 1983 provides a method for citizens to vindicate their federal constitutional and statutory rights against those who, acting under the authority of state law, have violated those rights. 42 U.S.C. § 1983; Albright v. Oliver, 510 U.S. 266, 271 (1994).

When subject to suit under § 1983, state and local officials may assert qualified immunity to shield them from liability for civil damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Therefore, in deciding whether a government official is entitled to qualified immunity, this court must determine whether there was a violation of a person's constitutional rights and then analyze whether the right was "clearly established" so that a reasonable officer

would know that his conduct was unlawful in the situation he confronted. Saucier v. Katz, 533 U.S. 194, 202 (2001). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. ____, ____, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier, the Supreme Court required that courts first analyze the threshold question of whether a constitutional right had been violated before turning to the question of whether the right was "clearly established." Saucier, 533 U.S. at 201. Since then, the Supreme Court has receded from the strict sequential analysis of Saucier, allowing courts to exercise their discretion on which analysis they take up first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). However, even as it receded from Saucier, the Pearson Court recognized the benefits of first determining whether a constitutional violation occurred before turning to whether the right was clearly established, indicating that it "often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." Id. at 236 (internal quotation marks omitted). For this reason, this court will first examine whether Plaintiff's arrest on a probation

violator warrant violated Plaintiff's Fourth Amendment rights
before turning to an analysis of whether the right Plaintiff
asserts was clearly established.

### i. No Violation of a Constitutional Right

In addressing whether a constitutional violation has
occurred, this court must first question whether Plaintiff's
arrest on a probation violator warrant infringed upon
Plaintiff's Fourth Amendment right to be free from unreasonable
seizures.  Because Defendants had a reasonable belief that
Plaintiff had violated a condition of his probation, this court
finds that Plaintiff's arrest did not violate Plaintiff's
constitutional rights.

In all candor, this court has some concern about what
Fourth Amendment protections may be applicable to a probationer
in advance of a probation violation proceeding.  Before this
court requested supplemental briefs, both parties based their
arguments on the presence or absence of probable cause,
believing that probable cause was the controlling standard.
(See, e.g., Compl. (Doc. 3) ¶ 54; Defs.' Mem. (Doc. 9) at 10.)
However, in Plaintiff's supplemental brief, Plaintiff concedes

that the arrest must only have been based on reasonable suspicion.[4]  (Pl.'s Supplemental Br. (Doc. 21) at 7.)

Any difficulty the parties had in identifying the correct standard stems from the fact that this area of the Fourth Amendment is particularly murky.  While the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause," the Supreme Court has recognized that probationers, like parolees, "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." Griffin v. Wisconsin, 483 U.S. 868, 874 (1987) (alteration in original) (quoting Morrissey v. Brewer, 408 U.S. 471, 480 (1972)).  Furthermore, the Fourth Circuit has long held that parole and probation violator warrants are different from warrants issued for those charged with a crime.  See Jarman v. United States, 92 F.2d 309, 311 (4th Cir. 1937) (finding a parole violator warrant satisfies two purposes: "to restore [the parolee] to actual custody" and "to advise him of the purpose of his reincarceration").

_____

[4] Plaintiff sought to amend his complaint to reflect this standard.  (Doc. 23.)  This court has not ruled on Plaintiff's motion to amend, but for the purposes of considering this motion, this court has considered the issues in light of the reasonable suspicion standard.  However, because this court ultimately finds it appropriate to grant summary judgment in this matter even after considering Plaintiff's new position, this court finds that additional amendments would be futile and will deny the Motion to Amend as moot.

The Supreme Court has outlined what due process rights probationers have during a probation revocation proceeding, <u>see</u> <u>Gagnon v. Scarpelli</u>, 411 U.S. 778 (1973), but this court has not found any cases clearly establishing the applicable constitutional standard on which a probationer may be arrested for a suspected probation violation.  <u>See</u> <u>Owens-El v. Brunson</u>, Civil No. WDQ-11-0523, 2011 WL 6651330 (D. Md. Dec. 14, 2011), <u>aff'd</u>, 477 F. App'x 27 (4th Cir. 2012) (recognizing that neither the Supreme Court nor the Fourth Circuit has announced the applicable standard).

Additionally, the federal and state statutes seem to apply different standards.  For federal probationers, 18 U.S.C. § 3606 provides that "[i]f there is probable cause to believe that a probationer or a person on supervised release has violated a condition of his probation or release, he may be arrested."  In the North Carolina probation system, section 15A-1345(a) of the North Carolina General Statutes only requires a written statement from the probation officer for arrest on a violation.

Ultimately, this court remains unsure whether the reasonable suspicion standard urged by the parties clearly applies.[5]

Nevertheless, this court finds that the Fourth Amendment reasonable suspicion standard advanced by the parties does have some logical force when applied in this area.  First, the Supreme Court and Fourth Circuit have determined that probationers' homes can be searched based on reasonable suspicion, even though a warrant to search the home of a citizen not on probation would require probable cause.  United States v. Knights, 534 U.S. 112, 121-22 (2001); United States v. Midgette, 478 F.3d 616, 625 (4th Cir. 2007).  Because the contours of both the search and seizure provisions of the Fourth Amendment are

---

[5] Because probationers are not entitled to the "full panoply" of Fourth Amendment rights, it is not altogether clear that "reasonableness" in the specific context of probation supervision requires justification for issuing a probation violator warrant.  To satisfy procedural due process requirements, the Supreme Court has identified two distinct components in making the decision to revoke probation: "(1) a retrospective factual question whether the probationer has violated a condition of probation; and (2) a discretionary determination by the sentencing authority whether violation of a condition warrants revocation of probation."  Black v. Romano, 471 U.S. 606, 611 (1985).  In making decisions concerning the rights of probationers, the Supreme Court has "sought to accommodate these interests while avoiding the imposition of rigid requirements that would threaten the informal nature of probation revocation proceedings."  Id.  Thus, although the Fourth Amendment reasonable suspicion standard as derived from the cases described herein does have some logical force, the "informal nature of probation revocation proceedings" and "avoiding the imposition of rigid requirements" could suggest other constitutional standards apply.

based on reasonableness, see Maryland v. King, 569 U.S. ____,

____, 133 S. Ct. 1958, 1969 (2013), it follows that the same

level of suspicion that can justify a search of a probationer's

home could justify the arrest of a probationer on suspicion of a

probation violation.  Cf. Knights, 534 U.S. at 121 ("Although

the Fourth Amendment ordinarily requires the degree of

probability embodied in the term 'probable cause,' a lesser

degree satisfies the Constitution when the balance of

governmental and private interests makes such a standard

reasonable."); Knox v. Smith, 342 F.3d 651, 657 (7th Cir. 2003)

(finding that, as in Knights, the balance of governmental and

private interests justified the arrest of a parolee based on

reasonable suspicion).

Second, allowing arrests for state probation violations

based on reasonable suspicion is supported by court decisions

affirming various parole and probation violator warrants based

on less than probable cause. For instance, courts have found

that state parole violator warrants can be issued on less than

probable cause. Knox, 342 F.3d at 657; see also United States ex

rel. Nicholson v. Dillard, 102 F.2d 94, 96 (4th Cir. 1939)

(finding that a parole violator warrant "is not to be judged by

the same standards as a warrant for the arrest of one merely

charged with [a] crime or a warrant for the search and seizure

of property"). Additionally, courts have found that federal

probation violator warrants are different from traditional arrest warrants and do not require the traditional components of a warrant, such as sworn facts given under oath or affirmation. See United States v. Garcia-Avalino, 444 F.3d 444 (5th Cir. 2006) (finding that a probation violator warrant can be issued without being based on sworn facts). But see United States v. Vargas-Amaya, 389 F.3d 901, 904 (9th Cir. 2004) (finding that traditional warrant requirements are implied with the use of the word "warrant" in the federal probation statute). These cases suggest that Plaintiff has a viable argument that probation violator warrants may be based on an officer's reasonable suspicion of a probation violation.

Therefore, for purposes of this motion only, this court will evaluate Defendants' Motion for Summary Judgment based upon Plaintiff's contention that the reasonable suspicion standard applies. As a result, this court examines whether, at the time of Plaintiff's arrest, Defendants had a reasonable suspicion that Plaintiff had violated a condition of his probation.

To determine whether a search or seizure is reasonable under the Fourth Amendment, this court "examin[es] the totality of the circumstances." Knights, 534 U.S. at 118 (citing Ohio v. Robinette, 519 U.S. 33, 39 (1996)). "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'" United States

v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Illinois v. Gates, 462
U.S., 213, 232 (1983)).  Nonetheless, the critical question is
whether, based on the facts available at the time of the
seizure, "[an] officer has a particularized and objective basis
for suspecting legal wrongdoing."  United States v. Arvizu, 534
U.S. 266, 273 (2002) (internal quotation marks omitted).
Specifically, an officer's reasonable suspicion "may be based
simply upon a tip that has 'some particular indicia of
reliability.'"  Midgette, 478 F.3d at 625 (quoting United States
v. Perkins, 363 F.3d 317, 324-26 (4th Cir. 2004)) (finding that
a tip from a fellow police officer that probationer was carrying
a weapon justified a probation officer's search of the
probationer).

In this case, the undisputed facts and the disputed facts
taken in the light most favorable to Plaintiff indicate that it
was reasonable for Defendants to conclude that Plaintiff was in
violation of the conditions of his probation.  To determine the
reasonableness of each Defendant's actions, this court must

consider the facts as they were available to each officer at the time of the arrest.[6]

Defendant Holbrook first became involved in Plaintiff's supervision -- other than confirming that Plaintiff had not paid the court costs and fines as required by the judgment -- when he received the violation report from Karl Waller. (Waller Aff. (Doc. 9-2) ¶¶ 29, 33.) Karl Waller is the Interstate Compact District Coordinator, charged with coordinating all communications with out-of-state authorities. (Id. ¶ 4.) He is not a party to this action. The February 4, 2012 violation report received by Defendant Holbrook was prepared by Waller and reported that Plaintiff had not paid the court costs and fines in accordance with the conditions of his probation. (Id. ¶ 32.) In mid-February, Defendant Holbrook received another communication from Waller, stating the monetary condition was still unmet. (See id. ¶ 33.)

_____

[6] Defendants sought Plaintiff's arrest for violation of two different conditions of his probation: (1) non-payment of fines and court costs and (2) absconding supervision. (Order for Arrest and Supporting Violation Reports (Doc. 9-11).) After Plaintiff paid the amount due and after learning that Plaintiff had permission from the Georgia Probation Office to move his residence, Defendant Holbrook wrote to the Guilford County Superior Court asking that the violation report be dismissed. (Letter from Brian Holbrook (Doc. 13-4).) Assuming without finding that Defendants may not have had reasonable suspicion to believe that Plaintiff was absconding, Plaintiff's arrest was not unreasonable, because it was supported by reasonable suspicion that Plaintiff was in violation of the monetary condition of his probation.

Defendant Chandrasuwan first became involved in Plaintiff's supervision when Defendant Holbrook told her that Plaintiff was in violation of his probation by not making payment. (Chandrasuwan Aff. (Doc. 9-13) ¶ 15.)  Defendant Holbrook directed her to follow up with Plaintiff about payment.  (Id. ¶ 16.)

For both Defendants, the reports of the NCICO formed the basis for their belief that Plaintiff was in violation of his probation.  Because Plaintiff was a North Carolina probationer but was residing in Georgia, the NCICO was solely responsible for communicating with probation officials in Georgia who were supervising Plaintiff on behalf of North Carolina.  See ICAOS Rule 2.101(b) ("All formal written, electronic, and oral communication regarding an offender under this compact shall be made only through the office of a state's compact administrator or the compact administrator's designated deputies.").  Because of the pivotal role the NCICO plays in communicating between Georgia and North Carolina, the reports of the NCICO carry "indicia of reliability."  See Midgette, 478 F.3d at 625. Therefore, Defendants reasonably relied on the information they received from the NCICO officers, and these reports formed a sufficient basis for the officers to reasonably believe that Plaintiff was in violation of his probation and should be arrested.  See United States v. Hensley, 469 U.S. 221, 229-33

(1985) (finding that officers are entitled to act on the reports of other officers so long as the officer who issues the report had a sufficient basis for making the report); McInnis v. Maine, 638 F.3d 18, 22 (1st Cir. 2011) (Souter, J., sitting by designation) (finding, that a probation officer's statement that a probationer was violating a condition of probation was, by itself, sufficient to form a reasonable basis to arrest the probationer, even when the probation department mistakenly believed that plaintiff's probation period was still ongoing); cf. United States v. Ramos-Cruz, 667 F.3d 487, 502 (4th Cir. 2012) (relying on the reports of colleagues was a sufficient basis for supporting a showing of probable cause).[7]

Additionally, the reports of the NCICO were corroborated by several sources: (1) Defendants were aware that the judgment against Plaintiff indicated that he was required to pay $471.50 at a schedule determined by probation officers (see Defs.' Mem.,

---

[7] Defendants could also have relied on the responses from the Georgia Compact Office, indicating that Plaintiff was aware of the responsibility to make payment and planned to pay by the end of January as a particularized and reasonable basis for believing that Plaintiff had violated a condition of his probation. Plaintiff disputes that he made such representations to members of the Georgia Compact Office, claiming that he never said he would pay by the end of January. However, Plaintiff's dispute of these facts is irrelevant because the "totality of the circumstances" analysis examines what the officers knew at the time of the seizure and determines whether the belief was reasonable based on those facts. Plaintiff has advanced no reason why Defendants should not have trusted the Georgia Compact Office reports.

Aff. of Brian Holbrook ("Holbrook Aff.") (Doc. 9-8) ¶ 8); and
(2) the Guilford County Clerk of Court represented to Defendant
Holbrook that Plaintiff's status was unpaid (id. ¶ 16). These
facts corroborate the information communicated to Defendants by
NCICO officials and make it reasonable for Defendants to have
relied on such reports. Therefore, based on the undisputed
reports of the NCICO, there is no genuine dispute that
Defendants had a particularized and objective basis for
believing that Plaintiff had violated a condition of his
probation.

Plaintiff makes two major arguments to assert that his
arrest was unreasonable when viewed through the totality of the
circumstances. Both arguments revolve around the fact that
probation officers did not complete a "DCC-2" form as required
by internal DCC procedures. As explained herein, Plaintiff's
arguments do not establish that Defendants lacked reasonable
suspicion to arrest Plaintiff for a probation violation.

First, Plaintiff asserts that the directive of the
probation office that Plaintiff pay his costs prior to July 2012
was not a valid condition of his probation, and as a result,
Defendants could not use a violation of that condition to
justify Plaintiff's arrest. Plaintiff argues that the original
due date for Plaintiff's payment of court costs was July 2012,
as indicated on the Bill of Cost. (Pl.'s Resp. (Doc. 13) at 17;

Bill of Cost (Doc. 13-2).) Thus, when the probation office set the due date at a point before July 2012, Defendants "modified" his probation. Pointing to section 15A-1343(c) of the North Carolina General Statutes, Plaintiff argues that he was entitled to "a written statement setting forth the modifications" to his probation. See N.C. Gen. Stat. § 15A-1343(c). Defendants did not provide written notice signed by Plaintiff of the due date for payment, and as a result, Plaintiff argues that Defendants improperly modified the conditions of probation and invalidated the condition. (Pl.'s Resp. (Doc. 13) at 11-15.) Therefore, Plaintiff argues that his failure to pay could not serve as the basis for believing that Plaintiff had violated his probation.

However, it is not clear whether the new due date set by the probation office was a "modification" of Plaintiff's probation. First, Defendants argue that the "Bill of Cost" was not part of the judgment against Plaintiff but rather a document produced by the clerk's office for Plaintiff's convenience. (Defs.' Reply to the Resp. to Defs.' Mot. for Summ. J. (Doc. 15) at 4 n.2.) Therefore, any deviation from the date on the Bill of Cost was not a modification of the conditions of probation. Second, Defendants point to the probation office's power to set the payment schedule as evidence that setting a due date does not constitute a "modification" of the conditions of probation. In its judgment against Plaintiff, the superior court delegated

-24-

the authority to set the payment schedule to Plaintiff's probation officer. (Judgment (Doc. 13-3) at 1.) The North Carolina probation statute gives courts the power to delegate this responsibility to probation officers. See N.C. Gen. Stat. § 15A-1343(g). Section 15A-1343(g) does not explicitly require that any change in the payment schedule be delivered in writing, require judicial approval for any changes in the payment schedule, or place any other limits on the discretion of the probation officer in setting the payment schedule. See id. Accordingly, Defendants argue that setting the due dates for payment in February 2012 was not a modification of Plaintiff's conditions of probation, and Plaintiff's lack of payment could serve as a reasonable basis for believing that Plaintiff violated his probation.

Both of the arguments appear to be plausible from the reading of the statute, and no North Carolina court has determined whether a probation officer's changing of the due date noted in the Bill of Cost, pursuant to the powers delegated to that probation officer by the court, constitutes a "modification" of a condition of probation that requires written notice. The cases cited by Plaintiff do not provide guidance on the issue. Instead, the cases Plaintiff cites involve a state court adding an additional condition of probation or making a material change to an existing condition without providing

-25-

written notice, rather than the probation office exercising its discretion in implementing a condition based on the court's original delegation of that discretion. See State v. Seek, 152 N.C. App. 237, 238, 566 S.E.2d 750, 751 (2002) (recognizing an ineffective modification when the trial court struck language from the original conditions of probation so that the condition that the probationer not "reside in any household with a minor child other than his own" became such that the probationer could not "reside in any household with a minor child"); State v. Suggs, 92 N.C. App. 112, 113, 373 S.E.2d 687, 688 (1988) (finding an ineffective modification when a state court added a condition of probation that the probationer surrender his driver's license and not operate a motor vehicle on a public highway for a period of six months without providing written notice).

Confronted with an unclear issue of state law, this court is hesitant to forecast how the state courts would resolve this ambiguity. See R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 500-01 (1941). However, in this matter, the unclear issue of state law does not prevent this court from determining whether Defendants had a sufficient basis for believing Plaintiff violated his probation. The "totality of the circumstances" analysis examines whether the facts as they were known to the Defendants formed a particularized and reasonable

basis for Defendants' belief.  Taylor v. Waters, 81 F.3d 429,

434 (4th Cir. 1996).  As mentioned above, Defendants believed

that Plaintiff was in violation of his conditions of probation

based on the reports of NCICO officers, the judgment in place

against Plaintiff, and the representations of the clerk of court

that the amount remained unpaid.  Plaintiff has cited no

authority to suggest that the probation officers had a duty to

look beyond the judgment rendered against Plaintiff and the

representations of NCICO officers to determine if the monetary

condition was valid.

Second, Plaintiff argues that Defendants' failure to comply

with DCC procedures makes the seizure unreasonable under Griffin

v. Wisconsin.  Plaintiff correctly points out that, in Griffin,

the Supreme Court affirmed the system of warrantless searches of

probationers created by Wisconsin's probation regulations.  See

Griffin, 483 U.S. at 880.  The Supreme Court found that the

"special needs" of monitoring probationers justified this system

of warrantless searches.  Id. at 875-80; see also Midgette, 478

F.3d at 623-24 (affirming North Carolina's system of warrantless

searches of probationers on similar grounds).  For a search to

be justified under the "special needs" exception, the search

must comply with the regulations set forth within the system of

warrantless searches.  See Griffin, 483 U.S. at 880.  Based on

this requirement set forth in Griffin, Plaintiff claims that,

because Defendants did not comply with the DCC-2 requirement set out in internal DCC regulations, the seizure cannot be reasonable.  (Pl.'s Supplemental Br. (Doc. 21) at 7-9.)

However, Plaintiff's reliance on Griffin is misplaced. Griffin was a "special needs" case where the plaintiff was challenging the constitutionality of Wisconsin's system of warrantless searches of probationers.  See Griffin, 483 U.S. at 875-76.  In this case, Plaintiff is only challenging his arrest and questioning whether, under the totality of the circumstances, there was sufficient justification for the arrest on a probation violation.  Therefore, this case is more similar to the Supreme Court's opinion in Knights.  See Knights, 534 U.S. at 117-18 (going beyond the holding in Griffin to find that the totality of the circumstances justified a warrantless search of probationer's home without relying on the "special needs" exception to the Fourth Amendment); see also United States v. Warren, 566 F.3d 1211, 1215 (10th Cir. 2009) (noting that the Griffin and Knights exceptions are often "conflated").

Plaintiff's arrest was "reasonable under the traditional Fourth Amendment approach of examining the totality of the circumstances," and as a result, the question of whether Defendants complied with all requirements of the probation system -- although it is a material issue in a "special needs"

analysis -- is not dispositive here.  See Knights, 534 U.S. at 118 (internal quotation marks omitted).

Because there are no genuine issues on whether Defendants possessed reasonable suspicion that Plaintiff has violated a condition of his probation, it is proper for this court to find that no constitutional violation occurred[8] and grant summary judgment on Plaintiff's § 1983 claim.

### ii.  No Clearly Established Right

Having found that no constitutional right was violated, this court need not delve into the question of whether the right to be arrested on a probation violator warrant only upon reasonable suspicion was "clearly established" at the time of Defendants' action.  Saucier, 533 U.S. at 202.  However, because Plaintiff first asserted in his complaint that he had a clearly

---

[8] Additionally, that Defendants (1) did not complete a DCC-2 and (2) attempted to reach Plaintiff personally rather than contacting the Georgia Compact Office (a violation of ICAOS Rule 2.101(d)) do not give rise to a § 1983 claim for denying due process in this instance.  "An agency's violation of its regulations is not unconstitutional unless the regulations are necessary to afford due process."  Bowens v. North Carolina Dep't of Human Resources, 710 F.2d 1015, 1019 (4th Cir. 1983); see also Morris v. City of Danville, 744 F.2d 1041, 1048 n.9 (4th Cir. 1984) ("[T]he mere fact that a state agency violates its own procedures does not, ipso facto, mean that it has contravened federal due process requirements.").  The Supreme Court has specified what procedural due process requirements that probationers are entitled to receive before probation is revoked, see Scarpelli, 411 U.S. at 781-82, and Plaintiff has not shown that the internal regulations he accuses Defendants of violating were necessary to afford Plaintiff due process.

established right not to be arrested on a probation violator warrant without probable cause, there is a lingering question of whether probationers have a clearly established right to be arrested for a probation violation only if the officer has probable cause to believe he is in violation of his probation. Finding that this right is not clearly established, this court determines that Defendants are entitled to qualified immunity, even if there was some sort of constitutional violation.

When examining whether government officials are entitled to qualified immunity, courts must determine whether a government official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. In determining whether a right was "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). As stated earlier, in making this determination, courts can be sure that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341; Willingham v. Crooke, 412 F.3d 553, 558 (4th Cir. 2005).

In this case, Plaintiff has not shown a clearly established right to be arrested on a probation violator warrant only when a probation officer has probable cause. As mentioned above, there

are no cases from the Fourth Circuit clarifying the level of justification required for arrests of probationers for probation violations, see Owens-El v. Brunson, Civil No.  WDQ-11-0523, 2011 WL 6651330 (D. Md. Dec. 14, 2011), aff'd, 477 F. App'x 27 (4th Cir. 2012), and the Supreme Court has continually confirmed that probationers do not enjoy the full panoply of rights that other citizens enjoy.  See Griffin, 483 U.S. at 874; see also Knights, 534 U.S. at 121-22 (finding that probationers' homes may be searched on reasonable suspicion).  Without any clear law demonstrating that probationers may only be arrested based upon probable cause, it would not have been apparent to a reasonable officer in Defendants' position that Plaintiff's arrest violated his rights.

Additionally, Plaintiff's arguments do not establish that Defendants were "plainly incompetent" or "knowingly violated the law" in making the decision to arrest Plaintiff for a probation violation.  Even assuming that Plaintiff's interpretation of state law on the modification issue is correct and probation officers improperly modified Plaintiff's probation without giving written notice, this would not prevent Defendants from being shielded by qualified immunity.  The qualified immunity analysis examines what a reasonable officer would know at the time of the alleged violation.  See Malley, 475 U.S. at 341. Just because Plaintiff interprets the North Carolina statutes to

require a DCC-2 or other written notice when probation officers exercise their discretion in setting a payment schedule does not mean that a reasonable probation officer would interpret the law in the same way.

As stated above, Defendants were both told by NCICO officials that Plaintiff had agreed to pay the costs as directed and that Plaintiff had not paid at the time the probation violator warrant was issued. "Under these facts and in light of the parties' reasonable, yet differing interpretations" of the probation modification requirements, the factual allegations do not establish that a reasonable officer in Defendants' position would have been "plainly incompetent or would have knowingly violated the law" in making the decision to seek and obtain an order to arrest Plaintiff for a probation violation. See Spiker v. Alleghany Cnty. Bd. of Probation & Parole, 920 F. Supp. 2d 580, 603-04 (W.D. Pa. 2013) (finding that probation officers were entitled to qualified immunity in a § 1983 action challenging the arrest of a probationer for not registering as a sex offender, even though the probation office had not fulfilled its legal duty of warning probationer that he must register), aff'd sub nom. Spiker v. Whittaker, 553 F. App'x. 275 (3d Cir. 2014).

Therefore, it appears that Defendants acted reasonably in determining that Plaintiff was in violation of his probation,

and based on the facts as they appeared to Defendants at the time of the arrest, it would not have been apparent to either probation officer that his or her actions violated a clearly established Constitutional right.  As a result, Defendants would both be entitled to qualified immunity if they indeed violated Plaintiff's Fourth Amendment rights.  Therefore, summary judgment is appropriate.

### B.  **Malicious Prosecution Claim**

After granting summary judgment on Plaintiff's § 1983 claim, this court has discretion on whether to exercise supplemental jurisdiction on the remaining malicious prosecution claim that is based on state law.  See 28 U.S.C. § 1367(a), (c).  However, because the federal claim has been dismissed before trial, the supplemental jurisdiction statute -- and the Supreme Court decision it codified -- has directed that the state claim be dismissed as well.  See 28 U.S.C. § 1367(c)(3); United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  Therefore, this court dismisses Plaintiff's malicious prosecution claim.

### IV.  CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 8) is **GRANTED** and that this case is **DISMISSED.** The claim brought pursuant to 42 U.S.C. § 1983 is **DISMISSED WITH PREJUDICE** and any state law claims are **DISMISSED WITHOUT PREJUDICE.**  To the extent required by any state law or rule of

procedure, the dismissal of any state law claims without prejudice is intended to permit Plaintiff to re-file those claims in state court should he choose to do so.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Amend (Doc. 23) is **DENIED AS MOOT**.  A judgment consistent with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 30th day of December, 2014.

_____
United States District Judge